UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: JENNIFER MADRON and
COYLEE MADRON,

Debtors.

No. 7-05-13666 ML

_____

LEA COUNTY STATE BANK,

    Plaintiff,

v.

Adversary No. 05-1179 M

COYLEE JAMES MADRON and
JENNIFER MADRON,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A trial on the merits of this adversary proceeding was held on October 18, 2006 to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A). Plaintiff, Lea County State Bank ("LCSB") was represented by James A. Askew. Defendants, Coylee James Madron and Jennifer Madron, were represented by Clarke C. Coll. At issue is whether the debt representing an overdraft in Jennifer Madron's checking account at LCSB is a debt that was obtained by false pretenses, a false representation, or actual fraud, rendering the debt non-dischargeable under 11 U.S.C. § 523(a)(2)(A). LCSB also requested an award of attorneys' fees and costs.

Defendants deposited into Jennifer Madron's account at LCSB a check which proved to be altered, resulting in an overdraft in the amount of $38,168.60. After considering the testimony and evidence presented at trial, and being otherwise sufficiently informed, the Court finds that

1

the circumstances which gave rise to the debt indicate that the Defendants had the requisite intent to defraud necessary to render the debt non-dischargeable under 11 U.S.C. § 523(a)(2)(A).[1] The Court does not find that LCSB is entitled to recover its attorneys' fees. In reaching this determination, the Court enters the following findings of fact and conclusions of law in accordance with Rule 7052, Fed.R.Bankr.P.

## FINDINGS OF FACT

1. Defendants filed a voluntary petition under Chapter 7 of the Bankruptcy Code on May 5, 2005.

2. Beginning in the Spring of 2004, Defendant Coylee Madron communicated via e-mail and telephone with a party who identified himself as Mohammed Bulama. These communications lasted over many months. (*See* Exhibit 40).

3. Mr. Bulama convinced Defendant Coylee Madron that he had a suitcase in Spain which contained $18,000,000.00, and that he needed Defendant's help to retrieve the suitcase. Mr. Bulama promised Defendant Coylee Madron that he would receive $4,000,000.00 for his help. (*See* Exhibit 40; *Testimony of Coylee Madron).*

4. Via e-mail and telephone communications, Mr. Bulama informed Defendant Coylee Madron that he would receive a check from Mr. Bulama's associate, Maxwell Carter, and instructed Defendant Coylee Madron to deposit the check and wire the funds to back to him, with the understanding that Mr. Bulama would then use the funds to transport the suitcase to the

---

[1]At the close of Plaintiff's case in chief, Defendants moved for a directed verdict, asserting that Plaintiff failed to prove by a preponderance of the evidence that the Defendants had the requisite intent to defraud required under 11 U.S.C. § 523(a)(2)(A). In issuing these Findings of Fact and Conclusions of Law, Defendants' motion for directed verdict is necessarily denied.

2

United States. (*See* Exhibit 40; *Testimony of Coylee Madron*).

5. Mohammed Bulama admitted in communications to Defendant Coylee Madron that he was under investigation for fraud and embezzlement. *Testimony of Coylee Madron; Deposition of Coylee Madron,* p. 15, lines 6-7 ("He said he [Mr. Bulama] was under investigation for fraud -- not fraud, embezzlement through his bank.").

6. Defendant Coylee Madron understood from communications with Mohammed Bulama that the source of the $18,000,000.00 was from kickbacks from American companies, and that Mr. Bulama wanted to get the money into the United States in order to avoid paying the taxes. *Testimony of Coylee Madron; Deposition of Coylee Madron,* p. 13, lines 13-19 ("He said it was a kickback from Halliburton while he was a bank manager . . . . it was funds that he got from Halliburton for giving the accounts.").

7. On or about September 1, 2004, Defendant Coylee Madron received a package that contained a check in the amount of $39,645.06 ("Check"). (Exhibit 2).

8. The Check was written on an account of Professional Plastics, Inc. ("Professional Plastics") at Bank of the West. (Exhibit 2). The Check was made payable to Defendant Coylee Madron. *Id.*

9. Defendant Coylee Madron was surprised to see that the Check was from Professional Plastics, but assumed that Professional Plastics was Maxwell Carter's company. *Testimony of Coylee Madron.*

10. Defendants had never heard of Professional Plastics prior to receiving the Check. Professional Plastics did not owe Defendants any money, and Defendants did not work for Professional Plastics. *Testimony of Coylee Madron and Jennifer Madron.*

3

11. On Friday, September 3, 2004 Defendants and Walter Madron, Defendant Coylee Madron's father, went to the Hobbs office of LCSB and asked to cash the Check. *Testimony of Donahsue Allen.*

12. Donahsue Allen, Vice-President and teller manager for LCSB, informed Defendants that LCSB could not cash the Check because Coylee Madron did not hold an account at LCSB. She attempted to verify the Check, but was unable to do so because the phone number to verify the Check was a #900 number, and LCSB does not allow outgoing calls to #900 numbers. (*Testimony of Donna Sue Allen).*

13. Ms. Allen suggested to Defendants that the Check could be sent for collection, which would involve sending the Check through regular United States mail to the bank the Check was drawn on, and waiting for confirmation that funds were available. Defendants did not agree to do that. (*Testimony of Donahsue Allen).*

14. Defendants left LCSB on September 3, 2004 without cashing or depositing the Check. (*Testimony of Donahsue Allen).*

15. Neither Jennifer Madron nor Coylee Madron told anyone at LCSB how they came into possession of the Check. (*Testimony of Donahsue Allen).*

16. Defendant Jennifer Madron maintained a checking account at LCSB ("Account"). (*See* Exhibit 6).

17. On September 7, 2004, Defendant Jennifer Madron deposited the Check into her Account. (*See* Exhibit 1).

18. Both Defendants endorsed the reverse side of the Check before it was deposited at LCSB. (*See* Exhibit 1).

19. The balance in Jennifer Madron's Account on the date the Check was deposited was $39.99. (*See* Exhibit 6).

20. LCSB placed a five-day hold on the Check. (*Testimony of Donahsue Allen).*

21. In accepting a check for deposit, employees of LCSB rely on the honesty of the bank's customers. (*Testimony of Donahsue Allen).* In determining whether to accept a check for deposit, they consider the relationship between the customer and LCSB and whether the customer has an account with LCSB.

22. The Check did not appear on its face to be altered. *(Testimony of Ms. D'Dee Winters).*

23. Defendant Jennifer Madron wrote the following checks to "cash" on the Account:

| Check No. | Date | Amount |
|---|---|---|
| Unnumbered | 9/8/04 | $ 4,000.00 (Exhibit 12) |
| 1474 | 9/8/04 | $    500.00 (Exhibit 14) |
| 1489 | 9/14/04 | $10,000.00 (Exhibit 11) |
| 1492 | 9/15/04 | $15,000.00 (Exhibit 10) |
| 1495 | 9/16/05 | $ 4,000.00 (Exhibit 9) |
| 1499 | 9/18/04 | $ 1,000.00 (Exhibit 8) |
| TOTAL: | | $34,500.00 |

24. Some of the checks written on the Account were cashed despite the hold placed on the Account. (*Testimony of Ms. Donahsue Allen and Ms. D'Dee Winters;* Exhibit 6).

25. Defendants withdrew funds from both the Lovington and Hobbs branches of LCSB. (*Testimony of Jennifer Madron*).

26. Defendants testified that they contacted LCSB after September 7, 2004 to find out whether the Check had cleared, and were told that it had cleared, but that after several days during which Defendants wrote checks on the Account, LCSB contacted them and told them to

5

stop writing checks on the Account. *Testimony of Jennifer Madron and Coylee Madron.* Neither Jennifer Madron nor Coylee Madron were able to identify the person at LCSB who informed them that the Check had cleared.

27. If a customer calls LCSB requesting information about his or her account, the LCSB employee can inform the customer the available balance shown on the account, but not whether a particular check has cleared. *Testimony of Donahsue Allen.* The Check never cleared the payor's bank. *Id.*

28. Defendants went to several different Western Union locations and a Wal-mart, and obtained money orders in the following amounts which they sent to persons in Canada and Nigeria at the direction of Mohammed Bulama:

| Date | Amount | Recipient/Location |
|---|---|---|
| 8/16/04 | $ 200.00 | Austine Ukomoh, Nigeria (Exhibit 37) |
| 8/27/04 | $ 500.00 | Ehijele Dandy (Exhibit 28) |
| 9/14/04 | $2,000.00 | Frank Aluko, Nigeria (Exhibit 38) |
| 9/14/04 | $2,000.00 | Peter Momoh, Nigeria (Exhibit 4) |
| 9/14/04 | $2,000.00 | Samuel Ajufo, Nigeria (Exhibit 3) |
| 9/14/04 | $2,000.00 | Ehijele Dandy, Nigeria (Exhibit 36) |
| 9/15/04 | $3,000.00 | John Blackwell (Exhibit 39) |
| 9/15/04 | $2,000.00 | Evens Aroguma, Nigeria (Exhibit 5) |
| 9/15/04 | $2,000.00 | Frank Aluko, Nigeria (Exhibit 33) |
| 9/15/04 | $2,000.00 | Frank Aluko, Nigeria (Exhibit 32) |
| 9/15/05 | $2,000.00 | Dandy Ehijele, Nigeria (Exhibit 34) |
| 9/15/04 | $2,000.00 | Evens Aroguma, Nigeria (Exhibit 35) |
| 9/16/04 | $3,500.00 | Mary Collins, Canada (Exhibit 31) |
| 9/17/04 | $2,000.00 | Frank Aluko, Nigeria (Exhibit 30) |
| 9/21/04 | $ 660.00 | Frank Aluko, Nigeria (Exhibit 29) |
| TOTAL: | $27,860.00 | |

29. Defendants also used some of the funds deposited into the Account for the following personal expenses: 1) the repayment of Defendant Coylee Madron's father for a computer (Check

6

No. 1473 for $1,300.00 - Exhibit 13); 2) payment of automobile repairs (Check No. 1471 for $944.35 - Exhibit 23); 3) purchase of a new guitar (Check No. 1495 for $517.56 - Exhibit 15); and 4) purchase of a new stove (Check No. 1490 for $382.03 - Exhibit 16).

30. The Check was returned to LCSB by Bank of the West. LCSB assumed the Check was returned as a check for insufficient funds. LCSB then attempted to resubmit the Check. (*Testimony of Ms. D'Dee Winters*).

31. By September 17, 2006, LCSB learned that the Check had been altered, and informed Defendant Coylee Madron that he would be required to cover the check. (*Testimony of Ms. Donahsue Allen*).

32. The resulting overdraft in the Account from the altered Check was $38,168.60. (*See* Exhibit 7).

## CONCLUSIONS OF LAW

1. This adversary proceeding to contest the dischargeability of a particular debt under 11 U.S.C. § 523(a)(2)(A) is a core proceeding. 28 U.S.C. § 157(b)(2)(I) ("Core proceedings include . . . determinations as to the dischargeablity of particular debts.")

2. Debts that are the result of false pretenses, a false representation, or actual fraud are non-dischargeable under 11 U.S.C. § 523(a)(2)(A). That section provides, in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt --
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by --
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

7

3.  To prevail under 11 U.S.C. § 523(a)(2)(A), the plaintiff must show by a preponderance of evidence, the following elements: 1) the defendant-debtor made a false representation; 2) the representation was made with the intent to deceive plaintiff; 3) the plaintiff relied on the representation; and 4) the representation caused the plaintiff to sustain a loss. *Fowler Bros v. Young, (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (elements for non-dischargeability under § 523(a)(2)(A)); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (establishing preponderance of evidence standard of proof for dischargeability actions under § 523).  *See also In re Lang,* 293 B.R. 501, 514 (10th Cir. BAP 2003)(summarizing the elements required under § 523(a)(2)(A)).   Plaintiff's reliance on the representation must be justifiable. *Field v. Mans,* 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

4.  Elements 3) and 4) are supported by the facts and are not disputed.  LCSB justifiably relied on the representation because there was nothing on the face of the Check which would indicate that it had been altered.   LCSB sustained a loss in the amount of $38,168.60 as a direct result of the dishonored Check and the Defendants' use of those funds.

5.  This case turns on whether Defendants had the requisite intent to deceive when they presented the altered Check to LCSB for deposit and used the funds.   In making this determination with regard to the Defendants' presentment of the Check, the second element requiring a misrepresentation is necessarily intertwined with the third element, intent to defraud. *See Sargent County Bank v. Yagow (In re Yagow),* 61 B.R. 109, 111 (Bankr.D.N.D. 1986) (noting in a case involving a debtor's alteration of checks presented to the bank that "[e]ach of the . . .elements . . . need not be individually identified in a particular case since a person's intent

8

is often incapable of direct proof and may be inferred from the totality of circumstances surrounding a transaction.") (citations omitted).[2] *See also, In re Maxwell,* 334 B.R. 736, 742 (Bankr.M.D.Fla. 2005) ("The false representation giving rise to the claim must have been knowingly and fraudulently made to except a debt from discharge.") (citing 4 Collier on Bankruptcy ¶ 523.08[1][d], at 523-44.9)).

   6.  Intent to deceive under 11 U.S.C. § 523(a)(2)(A) may be inferred based on the totality of circumstances surrounding the representation. *Young,* 91 F.3d at 1375 (citations omitted); *In re Diel,* 277 B.R. 778, 782 (Bankr.D.Kan. 2002), *clarified by* 2002 WL 32654837 (Bankr.D.Kan. 2002) ("The fraudulent intent element need not be shown by direct evidence, but may be inferred from the totality of the circumstances.") (citing *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *aff'd in part and vacated in part by* 35 Fed.Appx. 826, 2002 WL 1044832 (10th Cir. 2002)).

   7.  The court "'must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'" *Diel,* 277

---

[2]Some courts have found that the presentment of a bad check does not in itself constitute a misrepresentation. *See Tusco Grocers, Inc. v. Coatney (In re Coatney),* 185 B.R. 546, 549 (Bankr.N.D.Ohio 1995) (noting that there is a split in authority as to whether passing a bad check can form the basis of a cause of action under § 523(a)(2)(A), and explaining that some courts find that the issuance of a check constitutes an implied representation that there are sufficient funds in the account to cover payment of the check (citations omitted), while other courts "hold that a check is neither a statement nor a representation as to whether it will be honored upon presentment, and that no fraud will exist without some positive statement regarding the sufficiency of the debtor's bank balance."(citations omitted)). *Coatney* ultimately relied on *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) to conclude that plaintiff could not sustain its cause of action because the issuance and presentment of a check was not, in itself, a representation regarding the balance in the account or their intent to pay; any assurances that the checks would be made good would have to have been made at the time the check was presented to be actionable under 523(a)(2)(A). *Id.* at 550.

B.R. at 782 (quoting *Davis,* 246 B.R. at 652 (quoting 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 47:16, n.62)(1999)). "[T]he particular circumstances of the case and the demeanor and credibility of the witness play[ ] a very large role" in determining fraudulent intent. *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 786 (10th Cir. BAP 1998).

8. While intent to defraud may be inferred, it "may not be presumed; there must be a picture of deceptive conduct." *Van De Water v. Van De Water (In re Van De Water),* 180 B.R. 283, 288 (Bankr.D.N.M. 1995) (citing *In re Gans,* 75 B.R. 474, 486 (Bankr.S.D.N.Y. 1987)).

9. Recklessness with regard to the truth and accuracy of the facts may be sufficient to establish fraudulent intent within the meaning of 11 U.S.C. § 523(a)(2)(A). *In re McGuire,* 284 B.R. 481, 493 (Bankr.D.Colo. 2002) (stating that "[w]hile all not all courts agree, the Tenth Circuit has held that a finding of reckless disregard may satisfy the scienter element [under § 523(a)(2)(A).") (citing *Driggs v. Black (In re Black),* 787 F.2d 503, 506 (10th Cir. 1986) (finding that intend to defraud under § 523(a)(2)(B) may be inferred based on a "sufficiently reckless disregard of the accuracy of the facts."). "However, 'reckless disregard should be very narrowly interpreted." *Kukuk,* 225 B.R. at 787. "[A] misrepresentation is fraudulent only if the maker 'knows or believes that the matter is not what he represents it to be.'" *Id.* quoting Restatement (Second) of Torts § 526(a) (1976)).

10. The facts and surrounding circumstances indicate that Defendants knew or should have known that the Check was suspicious and acted with reckless disregard to the legitimacy of the Check sufficient to infer fraudulent intent. Coylee Madron admitted that he was surprised that the Check was from Professional Plastics, but he stated that he assumed Professional Plastics

10

was Maxwell Carter's company. When LCSB initially refused to cash the Check on the day Defendants first came to LCSB, Defendants declined Ms. Allen's offer to send the Check for collection through regular channels. Instead, Defendants deposited the Check the next business day, and wrote a check for "cash" the following day despite the fact that LCSB had placed a five-day hold on the Account. Coylee Madron knew through the e-mail communications prior to Defendants' presentment of the Check to LCSB that Mohammed Bulama was facing fraud and embezzlement charges, yet he agreed to assist Mr. Bulama. The scheme involved a very large sum of money, $18,000,000.00, from which Defendants hoped they would receive $4,000,000.00 in exchange for their assistance in the scheme. That Defendants believed in the scam and maintained their hope that Mr. Bulama's plan was legitimate does not absolve them from their willing participation in a fraudulent scheme.

    11. Plaintiff is not entitled to recover its attorneys' fees. Plaintiff asserts that N.M.S.A. 1978 § 55-3-417(b) (Repl. Pamp. 1993) entitles Plaintiff to recover its attorneys' fees incurred in prosecuting this action. That section provides, in relevant part:

> A drawee making payment may recover from any warrantor damages for breach of warranty . . . . In addition, the drawee is entitled to compensation for expenses and loss of interest resulting from the breach.

> N.M.S.A. 1978 § 55-3-417(b) (Repl. Pamp. 1993).

By presenting the Check to LCSB for payment, Defendants are warrantors within the meaning of N.M.S.A. 1978 § 55-3-417(a) (Repl. Pamp. 1993).[3] LCSB is a drawee. N.M.S.A. 1978 § 55-3-

---

[3]That section provides, in relevant part:
> If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment . . . warrant to the drawee making payment or accepting the draft in good faith that . . . . (2) the draft has not been altered.

11

103(a)(2) (Cum.Supp. 2005) ("'drawee' means a person ordered in a draft to make payment.").
As noted in Official Comment 5. to N.M.S.A. 1978 § 53-3-417 (Repl. Pamp. 1993), the measure of damages for breach of warranty does not expressly provide for attorneys' fees, yet "attorney's fees are not meant to be necessarily excluded . . . . because they fit within the language 'expenses . . . resulting from the breach.'"  There are no New Mexico cases addressing this issue.

LCSB cites a number of cases from outside this jurisdiction which award attorneys' fees under similar state statutes. *See, e.g., Hoppe v. Midwest Bank of Poplar Bluff,* 899 S.W.2d 879, 885 (Mo.App. 1995) (drawee could recover attorneys' fees from collecting bank incurred in defending payee's action based on breach of warranty that all signatures are genuine or authorized); *Lund v. Chemical Bank,* 675 F.Supp. 815, 819 (S.D.N.Y. 1987) (damages in indemnification action against depository bank based on breach of presentment warranty included attorneys' fees). *But compare, E.S.P., Inc. v. Midway Nat'l Bank of St. Paul,* 466 N.W.2d 417, 420 (Minn.App. 1991) (depository bank liable to drawee bank for attorneys' fees relating to conversion claim based on breach of presentment warranties, but could not recover attorneys' fees incurred in its indemnification action against depository bank absent contract provision providing for recovery of attorneys' fees).  However, the cases cited by Plaintiff involve actions between banks.  In this case, while the statute does not expressly exclude attorneys fees, neither does it expressly provide for it.  There is no evidence of a contract between LCSB and Defendants providing for a recovery of LCSB's attorneys' fees.  Under these circumstances, the Court declines to interpret N.M.S.A. 1978 § 53-3-417(Repl. Pamp. 1993) to

---

N.M.S.A. 1978 § 53-3-417(a)(2) (Repl.Pamp. 1993).

12

award LCSB its attorneys' fees.

Based on the foregoing, the Court concludes that the Plaintiff is entitled to a determination that the debt represented by the overdraft in the amount of $38,168.60 which resulted from the Defendants' deposit of the altered Check and subsequent use of the funds is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). A judgment will be entered in accordance with these findings of fact and conclusions of law.

_____
MARK B. McFEELEY
United States Bankruptcy Judge

COPY TO:

James A. Askew
Attorney for Plaintiff
PO Box 1888
Albuquerque, NM 87103-1888

Clarke C. Coll
Attorney for Defendants
PO Box 550
Roswell, NM 88202-0550